IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

SYLVIA L. TROTTER,
    Plaintiff,

vs.            Case No. 5:08cv318/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

  This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

  Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not fully supported by substantial evidence; the court thus recommends that the decision of the Commissioner be reversed and remanded for further proceedings.

## I. PROCEDURAL HISTORY

  Plaintiff's DIB application was denied initially (Tr. 35–37) and on reconsideration (Tr. 41–42).[1] On October 27, 2006, following a December 9, 2005, hearing at which Plaintiff was

_____

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed January 7, 2009 (Docs. 11, 12).

represented by counsel and testified, an administrative law judge ("ALJ") rendered a decision in which she found that Plaintiff was not under a "disability" as defined in the Act (Tr. 20–30).  On July 25, 2008, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 8–10).  Thus the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

In her October 27, 2006, decision the ALJ made several findings relative to the issues raised in this appeal (Tr. 20–30):

1)    Plaintiff met the insured status requirements of the Act through December 31, 2006.

2)    Plaintiff has not engaged in substantial gainful activity since December 6, 2004, her amended alleged disability onset date.[2]

3)    Plaintiff has the following severe impairments: chronic obstructive pulmonary disease ("COPD"), depression, and obesity.  Plaintiff's headaches, hiatal hernia/gastroesophageal reflux disorder ("GERD"), knee problems, diabetes, and hypertension are not severe impairments.

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)    Plaintiff has the residual functional capacity ("RFC") for a restricted range of light work.  Plaintiff is able to sit/stand/walk for six hours in an eight-hour workday.  She is able to occasionally lift twenty pounds and frequently lift ten pounds.  The work is to be unskilled and may not require concentrated exposure to excessive environmental respiratory irritants or frequent interaction with the public.

6)    Plaintiff is unable to perform any past relevant work.

7)    On Plaintiff's amended alleged disability onset date she was fifty years old, which is defined as an individual closely approaching advanced age.

8)    Plaintiff has a limited education and is able to communicate in English.

---

[2]  The time frame relevant to this appeal therefore is December 6, 2004 (Plaintiff's amended alleged disability onset date) through December 31, 2006 (Plaintiff's date last insured).

9)     Transferability of job skills is not an issue in this case because Plaintiff's past
       relevant work is unskilled.

10)    Considering Plaintiff's age, education, work experience, and RFC, there are jobs that
       exist in significant numbers in the national economy that Plaintiff can perform.  A
       finding of "not disabled" is reached by application of Medical-Vocational Rule
       202.11 and Social Security Ruling ("SSR") 85-15.

11)    Plaintiff has not been under a "disability," as defined in the Act, from December 6,
       2004, her amended alleged onset date, through the date of the decision.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT, and MEDICAL HISTORY

A.       Personal and Employment History

Plaintiff was born on December 6, 1954.  She has a ninth grade education and past relevant work experience as waitress, cook, and cashier, all of which jobs were unskilled and required light to medium exertion (Tr. 29).  Plaintiff protectively filed her DIB application on December 19, 2003, under her former name of Sylvia Lynn Adams, alleging that she became disabled on May 1, 2001, due to knee pain, COPD, and depression (Tr. 20, 34, 49–52).  During the hearing before the ALJ Plaintiff amended her alleged disability onset date to December 6, 2004, her fiftieth birthday (Tr. 284).

B.       Medical History[3]

The earliest medical record in the administrative file is dated October 17, 2001, when Plaintiff was tested for a sleep disorder (Tr. 109–15).  At that time Plaintiff reportedly weighed 268 pounds (Tr. 110); elsewhere in the record Plaintiff's height is noted to be 5' 11" (Tr. 158).  The sleep disorder test was negative for apnea/hyponea syndrome, but Plaintiff was advised to undergo an ear/nose/throat evaluation for snoring.

In January 2002 Plaintiff was admitted to Bay Medical Center for an acetaminophen overdose related to a suicide attempt (Tr. 116–20).  After being treated medically she was evaluated by a psychiatrist.  He diagnosed Plaintiff with major depression, "in addition to stressful events, including her mother's death and difficulty with her family," and suggested the use of antidepressant medications (Tr. 116).

The next record of medical care is dated November 5, 2003, when Plaintiff was advised by her health care provider at Bay County Community Health Center ("BCCHC") to undergo a pulmonary function test for her complaints of shortness of breath (Tr. 157).[4]  The test, which was conducted on November 14, 2003, reflected pre-medication pulmonary values within normal limits; the post-medication test indicated the possible existence of mild restrictive pulmonary disease (Tr.

---

[3]  As noted, the time frame that pertains to this appeal is December 6, 2004, through December 31, 2006.  The majority of Plaintiff's medical records are dated prior to the relevant period.  To the extent these earlier records may be relevant to issues raised in the appeal, and in the interest of placing the evidence in context and providing a complete picture of Plaintiff's medical history, the court includes a discussion of these records in its recitation of the facts.

[4]  The records from this source are handwritten.  Many of the photocopies are poor, and in places the notes are extremely difficult to decipher.

160). There were no significant pre/post medication changes (*Id.*). Other information provided with the report notes that Plaintiff weighed 222 pounds at the time; additionally, Plaintiff reported that she smoked one pack of cigarettes a day and had been a smoker for thirty-eight years (Tr. 158). Plaintiff also underwent an electrocardiogram in November 2003 which showed minor changes of equivocal significance only; the result was noted to be "borderline normal" (Tr. 171). Chest x-rays revealed small calcified pulmonary nodules in the lower and mid lung fields but no acute cardiopulmonary disease or pneumonia was demonstrable (Tr. 202–03). Blood work performed in November 2003 was within normal limits, except that Plaintiff's triglycerides and cholesterol levels were elevated (Tr. 170). Plaintiff returned to BCCHC in late November 2003 for a follow-up office call; the report of that visit notes that Plaintiff was assessed with dyslipidemia, COPD, and depression (Tr. 156). Plaintiff was started on medication for her dyslipidemia, counseled on the symptoms of depression and advised to return if the symptoms persisted, and encouraged to stop smoking (*Id.*).

In January 2004 Plaintiff was again seen at BCCHC (Tr. 155). Her weight was 217.5 pounds and her blood pressure was 118/78.[5] The assessment included crepitus in the left knee but an ability to ambulate well; dyslipidemia; and headaches (*Id.*) Medications and a knee brace were prescribed (*Id.*). At a follow-up visit Plaintiff reported that she had stopped smoking; she also complained of a sinus headache (Tr. 154). The report of a chest x-ray taken on January 24, 2004, noted bilateral pulmonary nodules, only one of which was calcified consistent with a granuloma, and three other nodules that could represent non-calcifying granulomata (Tr. 201). As follow-up, a computerized tomography ("CT") scan was recommended (*Id.*).

In March 2004, Jim Takach, M.D., a non-examining state agency physician, reviewed Plaintiff's medical records and completed a physical RFC assessment (Tr. 123–130). In his RFC report Dr. Takach opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk four hours, and sit about six hours in an eight-hour workday; her ability

---

[5] *The Merck Manual* describes readings of < 120 mm Hg (systolic) and < 80 mm Hg (diastolic) as being optimal; pressures of < 130 mm Hg (systolic) and < 85 mm Hg (diastolic) are normal; and pressures of 130–139 mm Hg (systolic) and 85–89 mm Hg (diastolic) are within the high normal range. *The Merck Manual* 1633 (17th ed. 1999). Systolic readings between 140–159 mm Hg or diastolic readings between 90–99 mm Hg are classified as Stage 1 hypertension, or mild (*Id.*).

to push and/or pull was unlimited (Tr. 124).  Dr. Takach further opined that Plaintiff occasionally required postural limitations with respect to climbing, balancing, stooping, kneeling, crouching, and crawling (but she could never climb ladders, ropes, or scaffolds) (Tr. 125).  Plaintiff should avoid concentrated exposure to extreme heat and cold and avoid even moderate exposure to fumes, odors, gases, poor ventilation, and hazards (Tr. 127).  Dr. Takach noted no manipulative, visual, or communicative limitations and no environment limitations with respect to wetness, humidity, noise, or vibration (Tr. 126–27).

A CT scan was performed on Plaintiff in April 2004 which revealed bilateral lung nodules (Tr. 200–01; *see also* Tr. 153).  The impression was old granulomatous disease, with only one of the nodules present not clearly calcified.  Also in April 2004, Clell C. Warriner, Ph.D., performed a psychological evaluation of Plaintiff at the Commissioner's request (Tr. 131–32).  In his report Dr. Warriner commented that Plaintiff described herself as anxious and her mood as depressed (Tr. 131).  According to Plaintiff, she had once been confident and outgoing but had developed a social phobia (*Id.*).  Plaintiff could perform serial threes with some hesitancy and one mistake, and she could remember three objects after ten minutes (Tr. 132).  Dr. Warriner noted that Plaintiff harbored constant suicidal thoughts "since she is convinced she can not go through the [recent] painful death she witnessed in her mother for whom she still carries a significant grief reaction" (*Id.*).  There was no evidence of delusions or hallucinations, schizophrenia, paranoia, bipolar disorder, or other debilitating mental illness, although Dr. Warriner noted Plaintiff's prior suicide attempt.  According to Dr. Warriner, Plaintiff suffered from significant depressive disorder "much of which is secondary to the grief reaction and to her fear of her impending death.  A biopsy of her lungs is scheduled but has not been conducted yet to confirm a cancerous condition"  (*Id.*).  Dr. Warriner's diagnosis was significant grief reaction and chronic pain disorder (moderate and intense).  He also noted depressive disorder with suicidal ideation, multiple physical problems, and the stress of inactivity and fear of impending death.  Dr. Warriner estimated Plaintiff's Global Assessment of Functioning ("GAF") rating to be 45 at that time (*Id.*).[6]

---

[6]  The GAF is a rating of overall psychological functioning on a scale of 0-100.  *Diagnostic and Statistical Manual of Mental Disorders* 34 (2000, 4th ed., text revision) ("DSM-IV-TR").  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 34.

In May 2004 pulmonary specialist George D. Yatzkan, M.D., examined Plaintiff (Tr. 183–85). Dr. Yatzkan noted no respiratory distress, with bilateral rhonchi and end expiratory wheezing mostly heard on forced expiration (Tr. 184). There was minimal edema in the extremities, non-pitting, with no neurological problems noted (*Id.*). Dr. Yatzkan's impression was abnormal chest x-ray; dyspnea, likely due to multiple factors, including COPD, being overweight, and deconditioning; COPD; and bronchial asthma without exacerbation (Tr. 185). Plaintiff was advised to complete pulmonary function testing and to undergo another CT in three months; her pulmonary medications were changed. Additionally, Plaintiff—who had resumed smoking—was strongly encouraged to stop (*Id.*).

A non-examining state agency psychologist, Robert Stainback, Ph.D., prepared a mental RFC assessment of Plaintiff dated May 3, 2004 (Tr. 133–36), in which he opined that Plaintiff was moderately limited with respect to the ability to: (1) understand, remember, and carry out detailed instructions; (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; and (5) set realistic goals or make plans independently of others (Tr. 133–34). In all other areas Dr. Stainback found no significant limitations. He concluded that Plaintiff retained the capacity to remember work locations and procedures. She could understand, remember, and carry out short, simple instructions but understanding, remembering, and carrying out detailed instructions might be more difficult for her due to her reported decline in concentration; nevertheless, she retained the ability to maintain attention and concentration for extended periods. Plaintiff's ability to maintain a consistent work pace and adhere to a schedule might be somewhat compromised by her psychological symptoms, but a useful degree of ability remained intact. She could make simple work-related decisions and sustain work activities without being overly distracted by coworkers or requiring special supervision. Her social and adaptive capacities were generally retained, but her independent planning ability might be compromised as well as her ability to interact regularly with the public. Taking into considering her presenting symptoms and the effects of those symptoms on her functioning, Dr. Stainback found that Plaintiff retained sufficient mental and social abilities needed

to sustain performance of simple work tasks.  Optimal work performance was likely to occur in settings with limited social demands (Tr. 135).  On the Psychiatric Review Technique ("PRT") form, Dr. Stainback determined that Plaintiff experienced the following functional limitations: mild restrictions with respect to the ability to perform activities of daily living and difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation (Tr. 147).

In June 2004 Plaintiff again presented at BCCHC; she was examined and prescribed numerous medications, including for chronic bronchitis, asthma, and COPD (Tr. 151–52).  She also underwent a follow-up CT scan of the chest in June 2004, which revealed no adenopathy; additionally, densities in the lungs were unchanged from the April 2004 study (Tr. 197).  The report also noted that an acute interstitial lung disease process was suggested from the "ground glass" appearance of portions of the upper lobes (*Id.*).

The report of a physical examination performed in July 2004 for Plaintiff's complaints of heartburn notes that Plaintiff's weight was 222 pounds and her blood pressure was 120/76 (Tr. 151).  Plaintiff denied shortness of breath and chest pains or tightness (*Id.*).  The assessment was GERD, chronic bronchitis, asthma, and COPD.  Sample medications were dispensed to Plaintiff, and she was advised to continue her other medications (*Id.*).

In an August 30, 2004, Bay Medical Center admission report, Dr. Yatzkan noted Plaintiff's abnormal chest x-ray; dyspnea, likely multifactorial; and COPD (Tr. 176).  He also noted that Plaintiff had stopped smoking in June 2004 (*id.*), although a pulmonary function test report dated August 4, 2004, suggests that Plaintiff reported being a one-pack-a-day smoker and had been for thirty-nine years (Tr. 195).  Bronchial biopsies obtained during a bronchoscopy showed benign lung tissue (Tr. 177), and other bronchial tests identified no tumors (Tr. 187–88).  Pulmonary function tests revealed mild obstructive changes with no significant response after a bronchodilator was administered (Tr. 193–96).  A chest x-ray revealed right upper lobe pneumonia and fullness in the superior mediastinum for which a follow-up test was recommended to rule out a central mass or adenopathy (Tr. 191).

At a follow-up office visit in September 2004 Dr. Yatzkan noted no respiratory distress and minimal inspiratory squeaks, with no wheezes or other adventitious sounds (Tr. 173).  Dr. Yatzkan's

impression was dypsnea on exertion, COPD, abnormal chest x-ray, hyperlipidema, and obesity (*Id.*). He recommended additional tests, including a cardiology evaluation and another CT scan (Tr. 174).

In October 2004 a non-examining state agency psychologist, William Himadi, Ph.D., prepared a mental RFC assessment of Plaintiff (Tr. 204–21). Dr. Hamadi's conclusion was that Plaintiff had a moderate limitation in her ability to understand, remember, and carry out detailed instructions. Also, her ability to maintain attention and concentration for extended periods and to work in coordination with or proximity to others without being distracted by them was moderately limited. She was similarly limited with respect to her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public (Tr. 204–05). In all other areas Plaintiff had no significant limitations. Dr. Himadi concluded that Plaintiff's daily and social functioning was impacted by depression and that she might have problems with sustained concentration in jobs requiring detailed instructions and complex tasks. She retained sufficient adaptive and cognitive skills for simple, routine, repetitive task performance on a sustained basis (Tr. 206).

Nancy L. Kopitnik, D.O., J.D., FCLM, a non-examining state agency physician, completed a physical RFC assessment of Plaintiff in October 2004 (Tr. 222–29). The form appears to have been prepared electronically, bears a handwritten date, and Dr. Kopitnik's typewritten name appears above the signature box on the form, but there is no handwritten signature affixed (Tr. 229). Dr. Kopitnik noted that Plaintiff had complaints of COPD and DJD [degenerative joint disease]; she also noted that Plaintiff suffered from hyperlipidemia, hiatal hernia, and deep vein thrombosis. Based on her review of Plaintiff's medical records, Dr. Kopitnik noted that Plaintiff's physical examination showed normal vision; no signs of CHF [congestive heart failure]; and normal motor strength, neurological examination, and gait (Tr. 227). Plaintiff suffered from severe COPD with multifactorial dyspnea (*Id.*). Her complaints were credible and consistent with the evidence of record (*Id.*). It was Dr. Kopitnik's opinion that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours, and sit about six hours in an eight-hour workday; her ability to push and/or pull was unlimited (Tr. 223). Dr. Kopitnik further opined that Plaintiff had occasional postural limitations with respect to climbing, balancing, stooping, kneeling,

crouching, and crawling (Tr. 224). Plaintiff should avoid even moderate exposure to fumes, odors, gases, and poor ventilation (Tr. 226). Dr. Kopitnik noted no manipulative, visual, or communicative limitations and no environment limitations with respect to extreme cold or heat, wetness, humidity, noise, vibration, or hazards (*Id.*).

The record of Plaintiff's additional medical history is not lengthy. Plaintiff's medical records include a report of a January 2005 chest CT which showed no evidence of end-stage lung disease or "honeycomb" lung although there was a ground glass appearance that might represent an acute phase of interstitial disease (Tr. 246). Also evident on the CT was bronchiectasis and bronchiolar dilatation (*Id.*). In January 2006 a blood test showed a glucose level of 138 (Tr. 265).[7] An office visit report notes that Plaintiff had diabetes mellitus that was not controlled (for which she was prescribed medication) and that her lipid profile had significantly improved (Tr. 256). Additionally, a chest x-ray taken in April 2006 showed no evidence of active lung disease or pleural change, with normal cardiac and mediastinal contours (Tr. 262). Plaintiff's weight on April 3, 2006, was 260 pounds, her blood pressure was 137/70, and her glucose level was 146 (Tr. 255). Her diagnoses were diabetes; hyperlipidemia; and COPD (*Id.*). Plaintiff was also diagnosed in April 2006 with a small hiatal hernia, which caused no obstruction (Tr. 261). A May 2006 ultrasound of Plaintiff's abdomen was unremarkable (Tr. 260), and a chest CT revealed no significant change from her January 2005 study (Tr. 259). The diagnosis was calcifying granuloma and unchanged small right pulmonary nodule (*Id.*). A May 2006 treatment note indicates that Plaintiff continued to complain of gastric pain, which was improved with medication; Plaintiff's hiatal hernia was described as mild (Tr. 254). In July 2006, Plaintiff presented to BCCHC for complaints of abdominal pain and headaches which responded to medication; her weight was noted to be 258.5 pounds, her blood pressure was 173/76, and her glucose level was 146 (Tr. 253).

V.    HEARING TESTIMONY

At the December 9, 2005, administrative hearing Plaintiff testified that she has difficulty breathing all of the time (Tr. 270). Cleaning her small house takes up to four hours because she must stop frequently and catch her breath (*Id.*). She sometimes awakens at night gasping for air and

---

[7]  The test report indicates that the normal glucose level is from 70-110 mg/dL.

often awakens with a headache and feeling lightheaded (*Id.*).  At least one of her breathing medications contains a steroid, which occasionally causes her throat to break out (Tr. 274).  Tylenol relieves her tension headache and arthritis pain (Tr. 271).  Her depression causes her to want to avoid being around others two to four times per month (Tr. 272).  Plaintiff has attempted suicide three times in her life, the first time as a teenager and the last time in 2002 (*Id.*; Tr. 280).  She continues to experience suicidal feelings but has not acted on them (Tr. 272).  Plaintiff has taken medication for depression in the past but it made her feel sick and made the depression worse; she is not currently being treated for depression (Tr. 272–73).

Plaintiff also testified that her weight of 250 pounds makes it difficult for her to work (Tr. 273).  She cannot stand for more than one hour at a time without her feet and knees swelling and her right knee giving out completely; she continues to take medication for her deep vein thrombosis condition (Tr. 274).  She also suffers problems with constipation and diarrhea, following bowel resection surgery in 2000 (Tr. 275).  Two to three times per week Plaintiff walks what she estimates to be either one-quarter mile or about one and one-half miles to a nearby creek, then returns to her home after a brief rest (Tr. 276–77).  Walking causes back spasms related to her breathing problems (Tr. 277).  Plaintiff described symptoms from diabetes, including being thirsty all of the time and feeling lightheaded when her glucose levels spike, and noted that she has suffered from bronchitis since she was a child (Tr. 283–84).  Plaintiff estimates that, given her conditions, she is able to work around the house for approximately four hours per day total (Tr. 278).

## VI.  DISCUSSION

Plaintiff makes numerous arguments in support of reversal with an award of benefits or, alternatively, remand for further proceedings, primary among them that the ALJ erred (1) in finding Plaintiff retained the RFC for light work; (2) by failing to incorporate all credited mental limitations in the mental RFC finding; and (3) by failing to obtain the testimony of a vocational expert ("VE") to determine whether jobs exist in the national economy which Plaintiff could perform.

### A.    Residual Functional Capacity for Light Work[8]

---

[8]  Light work is defined in 20 C.F.R. §§ 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this

Plaintiff first argues that the ALJ erred in finding she could perform light work. According to Plaintiff the ALJ committed harmful error by failing to address a material difference between Dr. Takach's March 2004 RFC assessment, which indicates that Plaintiff is only able to stand and/or walk four hours per eight-hour workday and thus is limited to sedentary work, and Dr. Kopitnik's October 2004 RFC assessment, which indicates that Plaintiff can stand and/or walk for six hours per workday and thus is capable of performing light work.  Plaintiff also contends that the ALJ failed to address the lack of a handwritten signature on Dr. Kopitnik's RFC assessment.  According to Plaintiff, who in her memorandum cites and quotes from Programs Operations Manual System ("POMS") § DI 26510.89 of the Commissioner's administrative rules, a medical consultant must affix her "actual, physical" signature to the RFC form.[9]  Plaintiff argues that Dr. Kopitnik's assessment should therefore be rejected, leaving Dr. Takach's assessment as the only credited opinion.  As Dr. Takach's assessment indicates that Plaintiff can only stand and/or walk up to four hours, Plaintiff submits, she cannot be found capable of performing light work.

As an initial matter, the court is not persuaded by Plaintiff's contention that the ALJ improperly relied on Dr. Kopitnik's unsigned RFC assessment.  Plaintiff did not provide a hard copy of POMS § DI 26510.89 as she states it existed when she filed her memorandum in May 2009, and the electronically accessed rule in its current form—apparently a revised version issued in June 2009—does not contain the language cited by Plaintiff.  The current version of the rule permits the actual physical signature *or* the approved electronic signature of the medical consultant.  *See* POMS § DI 26510.89(A)(4), revised June 2009.[10]  It thus appears that if the Commissioner once required medical consultants' handwritten signatures on RFC assessment he no longer does so.  Regardless, even assuming that at the time Dr. Kopitnik signed the RFC assessment in October 2004 she should

---

category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[9]  At page 9 of her memorandum Plaintiff states that POMS DI 26510.089 can be found at the following website: https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510089!opendocument

[10]  *See* https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510089!opendocument, last visited on October 14, 2009.

have signed it by hand, the court concludes the ALJ did not err in reviewing and relying on the document.  The RFC assessment clearly identifies Plaintiff by name and Social Security number, discusses her medical conditions and records with enough specificity to link them definitively to Plaintiff, and provides Dr. Kopitnik's name, medical specialty, credentials and educational background, and State of Florida licensing information.  Plaintiff cannot reasonably assert, and apparently does not assert, that the RFC assessment is not Dr. Kopitnik's work product or that Dr. Kopitnik is not qualified to render the medical opinions she did.  Indeed, while Dr. Kopitnik may have failed to comply with a rule that required a handwritten signature—an internal, procedural rule that has now evidently been changed to also permit authorized electronic signatures—the court does not perceive any compelling, substantive basis for rejecting the assessment.

With respect to whether the ALJ erred in concluding that Plaintiff retains the capacity to perform light work, the court finds as follows.  First, to the extent the ALJ accepted Dr. Kopitnik's opinion that Plaintiff could stand and/or walk six hours per eight-hour workday, as opposed to Dr. Takach's view that Plaintiff was limited to four hours of such activity, her reliance was not error. The medical record was far more developed in October 2004, when Dr. Kopitnik completed her opinion, than it was when Dr. Takach completed his in March 2004.  Available to Dr. Kopitnik, but not Dr. Takach, were more than six months of additional treatment notes, pulmonary function test results, and CT scan results.  Additionally, as required by SSR 96-6p, the ALJ considered the opinions of Drs. Kopitnik and Takach and also stated the weight she accorded their opinions.[11]  The ALJ was not, however, required to simply adopt these opinions in determining Plaintiff's physical RFC.  Rather, the responsibility of assessing a claimant's RFC lies with the ALJ.  *See* 20 C.F.R. § 404.1546(c).  In any event, the record supports the ALJ's assessment that Plaintiff's obesity and COPD limit her to performing light work that does not require concentrated exposure to excessive environmental respiratory irritants.[12]  As explained below, however, the court concludes that the ALJ

---

[11]  Social Security Ruling  96-6p provides that the ALJ may not ignore the opinions of state agency consultants and program psychologists and must explain the weight given to those opinions.  The failure to adequately address and explain the weight given to all medical reports in the text constitutes error under 20 C.F.R. § 404.1527(b).

[12]  The court addresses below  the additional limitation found by the ALJ that, based on Plaintiff's mental impairment, the work Plaintiff is able to perform cannot require frequent interaction with the public.

nevertheless erred in failing to also address and accept the postural limitations identified by both Dr. Takach and Dr. Kopitnik (Tr. 125, 224).

Citing SSR 02-1p, which provides that a diagnosis of obesity given by a treating source or consultative examiner is adequate to establish the condition as a medically determinable impairment, the ALJ found that Plaintiff is obese (Tr. 24–25).  The ALJ further noted, correctly, that none of Plaintiff's physicians have indicated that Plaintiff's obesity is disabling (Tr. 27).  The record also reflects that Plaintiff has undergone repeated pulmonary function testing and x-ray, CT, and other studies that reflect only mild restrictive pulmonary disease (Tr. 160, 177, 187–88, 193–96, 197, 246, 259, 262) and that this condition has been treated conservatively (*see*, *e.g.*, Tr. 151, 173, 184).  Moreover, the medical record documenting Plaintiff's nonsevere impairments does not suggest that Plaintiff is unable to perform light work.  The record does not contain any references to limitations or significant problems resulting from Plaintiff's diabetes mellitus, such as end organ damage (*see*, *e.g.*, Tr. 255, 256).  Nor does the record reveal significant problems with, or more than conservative treatment for, Plaintiff's other diagnosed conditions, including headaches, knee pain, hypertension, mild hiatal hernia, or GERD that would have more than a minimal effect on her ability to work (*see*, *e.g.*, Tr. 151, 154, 155, 253, 254, 255, 261).  The ALJ's physical RFC finding is also consistent with Plaintiff's hearing testimony that she is able to walk at least one-quarter mile, but perhaps as far as one and one-half miles, two to three times each week and that she is able to work around the house (Tr. 270, 276–77).  Although Plaintiff estimated the length of time she could work around the house each day to be approximately four hours (Tr. 278), the court is satisfied that the ALJ was entitled to discount Plaintiff's testimony insofar as it was inconsistent with the medical evidence (*see* Tr. 27–28).[13]

Notwithstanding the conclusion that the record supports the ALJ's finding that Plaintiff can perform light work with certain environmental restrictions, and although this particular issue is not specifically argued by Plaintiff, the court nevertheless concludes that the ALJ's failure to address Plaintiff's additional postural restrictions was error.  Dr. Takach and Dr. Kopitnik both opined that Plaintiff required certain postural limitations, including with respect to the ability to climb, balance,

---

[13]  In any event, Plaintiff does not challenge the ALJ's credibility determination.

stoop, kneel, crouch, and crawl. The ALJ stated that she gave the opinions of the state agency medical consultants significant weight "to the extent that they are generally consistent with the other evidence of record . . ." (Tr. 29). The postural limitations identified by Drs. Takach and Kopitnik are generally consistent with Plaintiff's other medical evidence regarding her conditions of obesity and COPD, but the ALJ failed to consider them in her RFC finding, as required by 20 C.F.R. § 404.1527(b).

In sum, competent, substantial evidence supports the AJL's finding that Plaintiff is able to stand and/or walk up to six hours per eight-hour workday. Accordingly, the court finds no error in the ALJ's physical RFC determination that Plaintiff is able to perform those demands of light work. Nevertheless, although the ALJ properly concluded that Plaintiff was limited to work that did not require concentrated exposure to excessive environment respiratory irritants, she erred when she failed to also take into account the postural limitations identified by Dr. Takach and Dr. Kopitnik in their non-examining consultative medical opinions.[14] Remand is therefore appropriate to allow the ALJ an opportunity to consider the effects of Plaintiff's postural limitations on her RFC.[15]

---

[14] Plaintiff also asserts that the ALJ erred in applying Medical-Vocational Rule 202.11, which applies to individuals who retain the capacity to perform light work, instead of Rule 201. 09 which applies to those able to perform sedentary work only. Under Rule 201.09, Plaintiff would be considered disabled. The court addresses below the issue of whether the ALJ erred in applying the Medical-Vocational Guidelines ("grids") in this case rather than obtaining the testimony of a VE.

[15] As noted, other than in passing reference, in this appeal Plaintiff does not present the issue of whether the ALJ committed reversible error by failing to consider her postural limitations, nor the Commissioner does mention the issue. Given the parties' failure to brief this matter, the court does not address whether, in light of the ALJ's other findings of fact and conclusions of law, her failure to consider Plaintiff's postural limitations might merely be harmless error.

B.      Mental Limitations

Plaintiff also argues that the ALJ committed reversible error with respect to her mental limitations because, without adequate explanation, the ALJ only restricted Plaintiff to work that does not require frequent interaction with the public.  The court disagrees.  First, the ALJ noted in her decision that Plaintiff testified at the administrative hearing that she was not currently under the care of a mental health professional and took no medications for any type of mental disorder (Tr. 27). Taking this testimony into account, as well as the other medical evidence of record concerning Plaintiff's depression—which includes references in Plaintiff's medical records to complaints of depression and Dr. Warriner's evaluation—the ALJ properly concluded that Plaintiff's depression could be accommodated by limiting her to work that did not require frequent interaction with the public.[16]  Additionally, the ALJ's step three analysis of Plaintiff's depression discusses reasons for finding that Plaintiff was only restricted to performing jobs that did not require frequent interaction with the public (Tr. 23–24).  In that analysis the ALJ thoroughly outlined the requirements of Listing 12.04 and then carefully considered the relatively limited record evidence of this condition, particularly for the period relevant to Plaintiff's disability claim.  *See*  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.  Based on the record evidence the ALJ concluded that Plaintiff suffers only mild restrictions in her activities of daily living (Tr. 24).  According to the ALJ, Plaintiff has moderate restrictions in connection with social functioning: she lives with her husband and stepson but does not like to be around other people and does not attend social events (*Id*.).  The ALJ cited Dr. Warriner's findings regarding Plaintiff's ability to perform serial threes, remember objects, and handle her own finances in concluding that Plaintiff has mild deficiencies with respect to concentration, persistence, and pace (*Id.).*  The ALJ also noted that Plaintiff has experienced no

---

[16]  Plaintiff asserts, in a footnote, that the ALJ's mental RFC finding that she is simply limited to no frequent interaction with the public is not supported by Dr. Warriner's GAF assessment of 45, which indicates serious impairment in functioning (Doc. 18 at 11 n.5).  Dr. Warriner made this assessment in April 2004, which was some time prior to the December 6, 2004, through December 31, 2006, period relevant to this appeal.  Moreover, this assessment was made in connection with Dr. Warriner's additional observations that much of Plaintiff's depression was secondary to a grief reaction following the recent death of her mother, who suffered from lung cancer, and to Plaintiff's fear of her own impending death as she awaited testing (which later proved to be negative) to determine whether she too had lung cancer. Given the timing of and specific circumstances described in Dr. Warriner's evaluation, the court perceives no error in the ALJ's mental RFC assessment.

episodes of deterioration or decompensation in a work or work-like setting since her amended alleged onset date of December 6, 2004. Plaintiff also does not suffer from a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause her to decompensate. There also was no history of one or more years of the inability to function outside a highly supportive living arrangement or indication for the continued need for such an arrangement or a complete inability to function outside the area of her own home (*Id.*). The ALJ therefore concluded that Plaintiff's depression did not meet the criteria of Listing 12.04. While this finding pertained specifically to the ALJ's step three determination, the accompanying discussion may also be applied to her ultimate determination regarding Plaintiff's mental limitations. In short, contrary to Plaintiff's assertion, the ALJ did provide a rationale—and one that is supported by substantial record evidence—for her mental RFC finding.

Given the court's conclusion that the ALJ's RFC determination regarding Plaintiff's severe mental impairment of depression is adequately articulated and supported by substantial medical evidence—and properly acknowledges the opinions of the state agency medical consultants—it need not address Plaintiff's additional argument that the ALJ improperly disregarded the mental limitations cited in the opinions of Drs. Stainback and Hamadi. Even so, the court notes that the restrictions discussed by Dr. Stainback in the Functional Reports and Summary portions of his report (Tr. 135) are generally consistent with the mental activities which Plaintiff acknowledges SSR 96-9p identifies as needed to perform unskilled work.[17] *See* SSR 96-9p. The activities listed in SSR 96-9p include understanding, remembering, and carrying out simple instructions; making simple work related decisions; responding appropriately to supervision and usual work situations; and dealing with changes in a routine work setting (*Id.*). While Dr. Stainback found that Plaintiff has some moderate limitations,[18] he concluded that she retains the ability to understand, remember, and carry

_____

[17]  Plaintiff acknowledges that although SSR-96-9p pertains to individuals who can perform less than a full range of sedentary work, "the discussion of unskilled work requirements is applicable to all exertional levels" (Doc. 18 at 12).

[18]  These include the ability to understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without

out short, simple instructions and the ability to maintain attention and concentration for extended periods (Tr. 135).  Plaintiff can also make simple work-related decisions, Dr. Stainback found, and could sustain work activities without being overly distracted or requiring special supervision.  Her tolerance for stress is moderate, though adequate for most new task situations.  Plaintiff generally retains social and adaptive capacities, though her independent planning ability and ability to interact regularly with the public might be compromised.  Dr. Stainback concluded that Plaintiff retains sufficient mental and social abilities needed to sustain performance of simple work tasks (*Id.*).  Furthermore, Dr. Stainback's conclusions regarding Plaintiff's functional mental limitations, as expressed in the PRT form he completed, were identical to those identified by the ALJ: mild restriction with respect to the ability to perform activities of daily living and difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation (Tr. 147).[19]

For all of the foregoing reasons, the court concludes that the ALJ's determination that Plaintiff is only restricted to work that does not require frequent interaction with the public is supported by substantial evidence.  The ALJ's mental RFC finding therefore is not error.

C.      Reliance on Medical-Vocational Guidelines

Finally, the court addresses Plaintiff's contention that reversal is appropriate because the ALJ should have obtained the testimony of a VE to determine whether work exists in the national economy that she can perform, thus erring at step five of the sequential analysis.

The ALJ's failure to take Plaintiff's postural limitations into consideration when making her RFC finding also affects her step five finding, since the grids are inapplicable if non-exertional impairments significantly limit Plaintiff's work skills.  Francis v. Heckler, 749 F.2d 1562, 1566–67

---

an unreasonable number and length of rest periods; interact appropriately with the general public; and set realistic goals or make plans independently of others (Tr. 133–34).

[19]  Dr. Himadi also found that Plaintiff has some moderate limitations (including with respect to her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work without being distracted by others; to complete a normal workday and workweek; to perform at a consistent pace; and to interact appropriately with the general public (Tr. 204–05)).  Dr. Himadi concluded, however, much as Dr. Stainback did, that Plaintiff retained sufficient adaptive and cognitive skills for simple, routine, repetitive task performance on a sustained basis (Tr. 206).

(11th Cir. 1985). Thus, in addition to remanding this case for consideration of the effect Plaintiff's postural limitations may have on her RFC, remand is also necessary for the ALJ to reconsider her conclusion at step five that work exists in the national economy that Plaintiff can perform.[20]

Although the court need not further address the ALJ's step five determination, it nevertheless notes the following concerns with the ALJ's decision and failure to obtain VE testimony. First, the Commissioner contends that the ALJ found that Plaintiff could perform the "full range of light work physical requirements . . . [with] some additional non-exertional impairments" which the ALJ determined did not significantly erode the occupational base (Doc. 22 at 8). Thus, according to the Commissioner, the ALJ's application of the grids was proper. But the ALJ specifically stated in her decision that Plaintiff is able only to perform a "restricted" range of light work (Tr. 30). To the extent the ALJ in fact found that Plaintiff could perform less than the full range of light work, it was error for her to fail to secure the testimony of a VE to determine whether the claimant is able to perform any jobs in the national economy. Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996) (indicating that the grids should not be used when "the claimant cannot perform a full range of employment at the appropriate level of exertion.").

Additionally, even if in stating that Plaintiff could perform a "restricted range of light work" the ALJ meant to refer to the non-exertional limitations she had found and that she in fact determined that Plaintiff could perform the full range of light work, the court nonetheless questions whether, under the circumstances of this case, the better course for the ALJ would have been to consult a VE. In the Eleventh Circuit, "[w]hen there have been nonexertional factors (such as depression . . .) alleged, the preferred method of demonstrating that the claimant can perform specific jobs is through the testimony of a vocational expert." MacGregor, 786 F.2d at 1054; *see also* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (finding exclusive reliance on the grids is not appropriate where the claimant has non-exertional impairments that significantly limit basic work skills). Furthermore, based on the record evidence of Plaintiff's severe impairments, including her non-exertional environmental, mental, and postural limitations, it is not entirely clear that she can do *unlimited* types

---

[20] As before, because the parties have not addressed the effect Plaintiff's postural limitations might have on her RFC and the work available to her, the court will not consider whether the ALJ's reliance strictly on the grids and SSR 85-15 to find Plaintiff "not disabled" arguably is harmless error.

of light work.  *See* <u>Walker</u>, 826 F.2d at 1002–03 (holding that exclusive reliance on the grids is not appropriate either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills).  Reliance on the grids in this case, even with reference to SSR 85-15, to direct a finding of non-disability therefore may not be sufficient.  For this reason, the court suggests that on remand the ALJ consider eliciting evidence from a VE to determine whether work exists in the national economy that Plaintiff can perform.

VII.   CONCLUSION

For the foregoing reasons, the court concludes that this case is due to be remanded for the ALJ to consider (1) the effect of Plaintiff's postural limitations on her RFC and (2) Plaintiff's ability, given all of her impairments and limitations, to perform work that exists in the national economy.

Accordingly, it is respectfully **RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to **REMAND** this case to the Administrative Law Judge for further proceedings consistent with the findings in this Report and Recommendation, and that the clerk be directed to close the file.

At Pensacola, Florida this 22<u>nd</u> day of October 2009.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).